UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
THE APOLLO THEATER FOUNDATION, INC.,    :
                                        :
                    Plaintiff,          :
                                        :        02 Civ. 10037 (DLC)
        -v-                             :
                                        :        OPINION AND ORDER
WESTERN INTERNATIONAL SYNDICATION and   :
INNER CITY THEATRE GROUP, INC.,         :
                                        :
                    Defendants.         :
                                        :
----------------------------------------X

Appearances:

For Plaintiff:

Kerry L. Konrad
Tai-Heng Cheng
Mariya S. Treisman
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017

For Defendant Western International
Syndication:

Gary S. Raskin
Garfield Tepper & Raskin
1801 Century Park East, Suite 2300
Los Angeles, CA 90067


DENISE COTE, District Judge:

        This case concerns an allegation by Apollo Theater

Foundation, Inc. ("Apollo") that the former licensed distributor

and producer of the television program "It's Showtime at the

Apollo," Western International Syndication Corp. ("Western") and

Inner City Theatre Group, Inc. ("ICTG"), infringed Apollo's

rights in its federally-registered trademark bearing the

program's name by producing and distributing a similar urban-themed variety show entitled "Showtime in Harlem" or "Showtime" following a breakdown in negotiations for renewal of the production and distribution licenses in 2002.  ICTG has settled with Apollo and is no longer a defendant in this case.  Following the completion of discovery, Apollo and Western both filed motions for partial summary judgment, and Apollo filed a motion for leave to file a second amended complaint.  For the following reasons, Apollo's partial summary judgment motion is granted, Western's partial summary judgment motion is granted in part, and Apollo's motion for leave to file a second amended complaint is denied.

## BACKGROUND

The following facts are undisputed, or viewed in the light most favorable to the party resisting summary judgment, unless otherwise noted.

### Apollo and the Apollo Show

Apollo is a non-profit foundation that operates the Apollo Theater ("Theater"), a well-known performance venue in Harlem that has operated since 1913 and that has offered entertainment targeted principally at the African-American community.  Since the 1930s, the Theater has hosted "Amateur Night" showcase performances that have helped launch the careers of many famed African-American artists, including Billie Holliday, Ella

Fitzgerald, James Brown, and Ray Charles.  These performances were eventually televised, and from 1987 until 2002, this television show (the "Apollo Show") was advertised and promoted under the name "It's Showtime at the Apollo" ("Trademark").  That name became a registered trademark in March 1989 in connection with "entertainment services in the nature of a live variety program and syndication of a television variety program."  The Trademark was originally owned by the Apollo Theatre Investors Group ("ATIG"), the former operators of the Theater.  ATIG sold substantially all of its business assets, including the Trademark, to Apollo in 1992, when Apollo was formed.

Features of the Apollo Show include the phrase, "Where Stars Are Born and Legends Made," a reference to a sign that has hung above the doors of the Theater since 1943, and a phrase that has been used by Apollo in advertising and promotions for the Show and the Theater.  The Apollo Show also incorporates the so-called "Tree of Hope," which is a piece of a tree that was originally located outside the Harlem Lafayette Theatre, and that held symbolic value for performing artists.  The Tree of Hope is located stage right in the Theater, and amateur performers often rub the tree for good luck immediately prior to performing in the Apollo Show.  Other features include an "executioner" who removes from the stage performers who meet with audience disapproval, and an "Amateur Night" sign.

<u>Western</u>

Western is a national producer and distributor of television programs. Western began distributing the Apollo Show in 1989 pursuant to an agreement with ATIG. When ATIG sold its assets to Apollo in 1992, its successor-in-interest concluded an agreement granting ICTG a license to use the Trademark in connection with the production, promotion, and distribution of the Apollo Show. Western continued to have exclusive distribution rights pursuant to its 1989 agreement with ATIG, followed by a 1995 distribution agreement with ICTG. There is no dispute that Western owns the copyright for the recorded broadcasts of the Apollo Show for the time that it distributed the Show.

A distributor of television programs may engage in "domestic syndication," whereby programs are distributed to local television stations across the United States. Distributors market their programs to stations in an attempt to obtain commitments from them called "clearances" to run their programs for the upcoming season. Television seasons run for one year beginning each September. The peak time for marketing and obtaining clearances is in January, approximately nine months before the new season begins, coinciding with a national convention that facilitates distributors' marketing to local television stations. Western was responsible for domestically syndicating the Apollo Show.

<u>Trademark Licensing Agreements and Associated Contracts</u>

On September 22, 1998, Apollo entered into a license agreement ("License Agreement") with Western and ICTG, granting them the exclusive worldwide right and license to use the Trademark "solely . . . in connection with the production, marketing, syndication, distribution and broadcasting of [an] ICTG/Western-produced television program entitled 'It's Showtime at the Apollo' and consisting of a one-hour amateur contest, hosted by a celebrity." The License Agreement was renewed and modified by a separate license renewal agreement on August 1, 1999 ("License Renewal"). The License Renewal extended the period of the Trademark license to Western and ICTG through September 22, 2002, and provided for a good faith negotiation process should Western or ICTG wish to extend the license for an additional period:

> On or before April 1, 2002, Western and ICTG shall have the right by notice in writing to the Foundation to cause the parties to enter into a two (2) week period of good-faith negotiations for further renewal of the License Agreement for an additional period of two (2) years to commence upon expiration of the renewal . . . .

Western notified Apollo on April 1, 2002 that it intended to enter into such negotiations.

Apollo states that by the time Western indicated its intent to enter into license renewal negotiations, Western had already obtained clearances from television stations for the Apollo Show for the upcoming season. Apollo points out that a number of clearance contracts that Western negotiated for the Apollo Show

for the 2002/2003 broadcast season contained clauses stating that Western reserved the right "to offer the show under a different title so long as the show format and creative elements do not vary significantly from its current form, function and elements as outlined above."  One such contract was executed by a television station program director in St. Louis on April 4, 2002.  A number of those contracts were concluded in August 2002, by which point, according to at least one witness's deposition, Western knew that it would not be receiving a license renewal.

On August 15, 2002, Apollo concluded a Production, Distribution and Advertising Sales Agreement ("Heritage Agreement") with Heritage Networks, LLC, Heritage 215 Entertainment, LLC, and Heritage/Baruch Television Distribution, LLC (collectively, "Heritage"), that licensed the use of the Trademark and the Theater to Heritage for the 2002/2003 season and provided that Heritage would distribute the Apollo Show for that season.  The Heritage Agreement provided for a third party producer, dePasse Entertainment.  Among the provisions of the Heritage Agreement was a clause stating that "[t]he budget for production of the Series shall be not less than $3.5 million nor more than $4.5 million (including all fees to the Producer and Executive Producer fee . . .) and shall be set forth . . . with such changes as the Foundation, Heritage and the Producer shall mutually agree . . . ."  The actual budget for the Apollo Show in the 2002/2003 season was $5,372,961.  The Heritage Agreement also provided that "Distribution Expenses shall not include any

interest or financing charges or any overhead or general administration expenses,"[1] and that Heritage would pay Apollo a fee of $1.6 million for the license to use the Trademark. Heritage's obligation to pay this license fee was "absolute and unconditional."  Heritage's obligation to pay the license fee would be secured by delivering to Apollo an irrevocable letter of credit issued by Comerica Bank ("Comerica") for the fee amount.

On January 3, 2003, Heritage entered into a Loan and Security Agreement ("Loan Agreement") with Comerica in order to finance its production and distribution costs.  The Loan Agreement provides that Heritage would borrow up to $6,147,961 from Comerica.  The Loan Agreement also grants Comerica an unconditional lien on all of Heritage's revenue from the Apollo Show as security for "the absolute, indefeasible, irrevocable, proper, timely and unconditional payment, performance and discharge of all of the Obligations."  The "Obligations" contained in the Loan Agreement include:

> all present and future loans, advances, liabilities, obligations, covenants, duties, and indebtedness owing by: (a) any Borrower to the Bank; . . . (c) any Guarantor to the Bank; . . . including, without limitation, all principal, interest, charges, expenses, fees, attorneys' fees, filing fees and any other sums chargeable to any such Person hereunder . . . .

---

[1]  The Heritage Agreement defines "Distribution Expenses" as "all reasonable, usual and customary expenses of distribution of the Series," and states that this includes, among other things, "station compensation, tape reproduction and distribution, marketing, promotional and advertising expense, consumer and trade promotions directly related to the Series," and that Distribution Expenses shall be "pursuant to a budget to be mutually approved" by the Apollo and Heritage.

(Emphasis supplied.)

Apollo entered into an Accommodation Security Agreement ("ASA") with Comerica in order to provide the security necessary for Comerica to provide the loan to Heritage for its production and distribution costs. The ASA defines the "Borrowers" as Heritage, the "Bank" as Comerica, the "Accommodation Party" as Apollo, and the "Foundation Agreement" as the Heritage Agreement. The ASA notes that under the Loan Agreement, "the Borrowers granted to the Bank a continuing first priority security interest in and to, and lien upon, the Collateral," which includes "all right, title and interest of the Borrowers in and in connection with the Foundation Agreement, the Series and the proceeds thereof." The ASA grants Comerica an unconditional lien on all of Apollo's rights to the "Adjusted Gross Proceeds" from the Apollo Show as security for "the absolute, indefeasible, irrevocable and unconditional payment, performance and discharge of the [Borrower] Obligations and the Accommodation Party Obligations in full." "Adjusted Gross Proceeds" are defined as the sum of "all gross monies and other consideration received by or credited to the account of Heritage . . . from all sources for the broadcasting, distribution, exhibition and exploitation of the Series and all rights therein, after deduction of agency commissions." The ASA collectively describes the items belonging to Apollo in which Comerica retains an interest as the "Accommodation Party Collateral."

The ASA continues as follows:

> The amounts recoupable by the Borrowers from Adjusted
> Gross Receipts include the "License Fee," the
> "Distribution Expenses" and the "Production Expenses"
> (as each such term is defined in the Foundation
> Agreement) as well as all fees, costs, expenses,
> interest, and other charges of the Bank under, arising
> out of or in connection with the Loan Agreement and
> other Loan Documents in any way related to the Series
> and are included as part of the Collateral and the
> Accommodation Party Collateral.

Finally, the ASA provides that

> [a]s between the Accommodation Party and the Bank, all
> consents and approvals required to be given by
> Accommodation Party under or in connection with the
> Foundation Agreement irrevocably and unconditionally
> have been given or waived by Accommodation Party
> including, without limitation, approval of: . . . (v)
> the "Distribution Expenses" . . . and the budget
> therefore; (vi) the "Production Expenses" . . . and the
> budget therefore; and (vii) the Loan Agreement.

## The 2002/2003 Negotiations and Television Season

The two-week negotiation period started with Western's April
1, 2002 notification to Apollo that it intended to enter into
license renewal negotiations and did not generate a license
renewal agreement.[2]  Before and during this time, Western was
already contracting with television stations to distribute the
Apollo Show for the upcoming season.  Western did not provide an
initial proposal for the terms of a license renewal until April

---

[2]  Apollo's position on the existence of undisputed facts is
unclear in some instances.  For example, where Western disputed
facts that Apollo suggested were undisputed in its statement of
facts pursuant to Local Rule 56.1, Apollo's reply mistakenly
listed its own assertions of fact as Western's assertions of
fact, and then "responded" by indicating that it did not dispute
the assertion.

22, which was after the conclusion of the two-week period. Apollo made a counter-proposal on or about June 13, and Western responded on July 17 with a further counter-proposal for a seven year license extension. In the July 17 counter-offer, Western asserted that Western owned the rights to the format of the Apollo Show, and stated that an important reason for Apollo to choose to continue to work with Western as opposed to another distributor was that Western "would provide its station contracts and time slots, which obviously are very valuable, and a key ingredient to actually airing the Series." Western's counter-proposal continued: "[T]he Foundation should be aware that these slots are extraordinarily difficult to obtain (and [Western] is contractually permitted to place other shows into these slots) and these slots are of significant value to any producer of the Series."

A letter dated July 31, 2002 from Apollo's counsel to Western's counsel indicates that on July 25, Apollo rejected the July 17 Western counter-proposal and proposed a one-year license extension on terms similar to its June proposal. The letter notes that Apollo set a deadline of July 31, that Western had not responded to repeated contact attempts, and that Apollo was therefore assuming that the license would not be renewed. Western admits that it was aware by July 31 that the license would not be renewed. A clearance contract from Western offering the Apollo Show was executed by the President of a Pennsylvania television station and the National Sales Manager of Western on

August 7, and includes a handwritten note stating: "WGAL will begin airing Showtime at the Apollo the week of September 30, 2002." According to an Apollo expert report, the last known Western clearance contract offering the Apollo Show was signed by Western and a Portland, Oregon television station on August 14.

Western issued a press release on August 13 entitled "Western International Syndication and Inner City Theater Group Hits the Road with Showtime Live." Western and ICTG developed a competing program to fill the clearances Western had obtained for the Apollo Show. The title of the competing program was different in various promotional materials, but it was commonly referred to as either "Showtime," or "Showtime in Harlem." Showtime in Harlem was also an urban-themed variety show, although it was not filmed in Harlem. It incorporated features such as a piece of a tree located stage right that performers would rub immediately prior to performing, an "executioner" who removed from the stage performers who met with audience disapproval, and an "Amateur Night" sign. Materials used to promote Showtime in Harlem to television stations and advertisers used phrases such as: "Showtime - Where Dreams Are Born and Legends Are Made," "Harlem's Original Amateur Night," and "In its 16th season, Showtime remains . . . a mainstay in African-American entertainment." The website for Showtime in Harlem featured a large-font title reading: "It's Showtime at the Apollo!" This sentence would then appear to explode, and would be replaced by "Showtime in Harlem." An Apollo expert report

quotes an August 19 letter from Christopher Lancey, Western's CEO, to Michael Auerbach of King World Media Sales ("King World"), a prominent media sales company that Western had retained since 1989 to sell thirty-second national commercials to run during the Apollo Show, which stated:

> Pursuant to our conversation of August 14, 2002, we agree to amend our May 8, 1989 Barter Sales Agreement by replacing the trade name "It's Showtime at the Apollo" with the prospective working titles inclusive of "Showtime Live" or "It's Showtime in Harlem". As we previously stated, the title and venue change, however, is the ONLY difference. Viewers will continue to enjoy the exact same show they have come to expect for the past 15 years . . . .

The Apollo Show continued after the Trademark and permission to use the Theater had been licensed to Heritage. The financial impact that the late licensing of the Apollo Show had on its revenues for the 2002/2003 season is discussed in the context of Apollo's profits below.


Western's Profits

Western contends that it lost over $1,600,000 in connection with "Showtime in Harlem," because its costs exceeded $6,800,000 and its revenue was $5,177,104. Western supports this claim with documentation indicating that its revenue derived from two sources: King World, and Creative Television Marketing ("Creative"), another media sales company that Western retained to sell ten-second promotional spots to run during the program. The revenue derived from King World was $4,960,858, and the revenue derived from Creative was $216,246, for a total revenue

of $5,177,104.  Western documents its costs as expenses for the physical production of the program of $4,051,159, residuals to performers who appeared on episodes broadcast during the 2002/2003 season of $487,972, fees to the production guarantor of $81,000, costs for publicity, promotions, and advertisements of $129,199, marketing costs of $105,719, fees to viewer rating companies such as Neilsen Media Research of $150,048, expenses for physical distribution of episodes, such as satellite or video tape delivery, of $126,722, a loan origination fee for a loan to finance production and distribution of $128,000, interest on its loan of $295,082, legal fees of $15,000 in securing the loan, and television station compensation fees of approximately $1,100,000, for a total of $6,669,901.  Western also seeks to include in its cost figure a loan renewal fee of $72,530 for its failure to repay the financing in full prior to the maturity date.[3]

## Apollo's Profits

Apollo presents two expert reports to attempt to quantify the effect that Western's purported trademark infringement had on Apollo's profits.  A report by David Bivens, a media consultant, considers the advertising and viewer market for the Apollo Show and estimates the negative effect that Western's launching of a

---

[3] An attachment to a plaintiff expert report by David Bivens indicates that Western's gross revenue in the 2002/2003 season for its competing show was $6,642,444, and its adjusted gross revenue after deducting the advertising agency commission was $5,646,077.

competing program and its methods of marketing that program would have had on Apollo's ability to secure station clearances for the Apollo Show, obtain advertisers, reach Apollo's desired audience, and ultimately, receive revenue.  The factors considered in the Bivens Report include the fact that Heritage, and consequently Apollo, missed the "upfront" market for obtaining clearances and advertising because they were unable to attempt to secure such commitments until just before the 2002/2003 television season began in September.  Other factors included Western's moves to block Apollo's access to clearances and advertisers by obfuscating the pedigree of Showtime in Harlem, and by notifying former Apollo Show stations that Western would enforce the clause permitting it to replace the Apollo Show with a different show and in any event would not release them from the contracts.  The Bivens Report quotes an August 19 draft letter to the "TV Station Contact List" stating that Western "will be providing to your station the television program 'Showtime' for airing in the time slots provided in [your] contract."

The Bivens Report compares various costs for the Apollo Show in the 2002/2003 season to previous seasons to illustrate important differences.  For example, station compensation costs for the Apollo Show in the 1999/2000 and 2000/2001 seasons were approximately $240,000, and were reduced to approximately $100,000 in the 2001/2002 season.  In the 2002/2003 season, however, these costs soared to $1,492,000, representing "strenuous efforts to secure key-market clearance and adequate

total U.S. coverage," mostly for "secondary clearances due to Showtime's retention of the primary clearances." The Bivens Report also evaluates previous advertising revenue trends for the Apollo Show, concluding that the Apollo Show's projected advertising revenues of $10.2 million for the 2002/2003 season represented a reasonable projection assuming the Apollo Show would be without a competing Western-distributed program. Nevertheless, the Apollo Show's actual gross advertising revenues for the 2002/2003 season were approximately $7.9 million. The Bivens Report attributes this shortfall to "[i]mpaired or infringed station clearances," "[i]mpaired ratings due to an infringing program, infringing promotion of that program, and audience confusion," and "[i]mpaired or infringed access to Apollo's upfront advertisers that were pre-sold by KingWorld [sic] and transferred to Showtime."

The Bivens Report generates five hypothetical "scenarios" that estimate the negative impact of Western's competing program under different sets of assumptions and conditions. The variables these scenarios adjust are whether or not a competing show distributed by Western exists, whether or not that show infringes the Trademark, whether or not Western retains its primary station clearances for its show, and whether or not Western obstructs Apollo's access to up-front advertisers.[4]

_____

[4] "Up-front" advertisers are those who buy advertising slots from a show's marketer typically from April to June preceding the fall television season. Marketers guarantee the up-front advertisers that the show in question will deliver a

These scenarios estimate what the Apollo Show's household market share ratings would be under these varying conditions, as well as what advertising revenue Apollo could have grossed. In each of the five scenarios, production costs are assumed to be $4.5 million pursuant to the terms of the Heritage Agreement. Distribution costs increase depending on the level of competition and infringement by Western. Thus, Scenario One assumes Western has not generated a competing show, and Apollo generates a total revenue of $11 million. Scenario Two assumes Western has fairly produced a non-infringing show, and has not attempted to retain its primary station clearances or up-front advertisers. Scenario Three assumes Western has fairly produced a non-infringing show, but has retained its primary clearances. Scenario Four assumes Western has unfairly produced an infringing show, and has retained its primary clearances, but has not retained its up-front advertisers. Scenario Five assumes Western has unfairly produced an infringing show, and has retained both its primary clearances, and its up-front advertisers. Scenario Five generates financial results for Apollo that mirror Apollo's actual revenues during the 2002/2003 season.

A report by Justin McLean, an economic consultant, utilizes the figures generated by the Bivens Report, as well as financial statements, depositions, and other documents, to attempt to

_____

particular size of audience as promised. If the show does not attract the promised ratings, the seller must either give extra advertising slots to the advertiser for free, or must refund a portion of the advertiser's payments.

calculate the profits Apollo would have generated were it not for Western's creation and distribution of Showtime in Harlem, as well as to determine the value of a license fee that would have resulted from hypothetical negotiations between Apollo and Western during September 2002. The McLean Report includes a chart that utilizes figures derived from the Bivens Report's five scenarios, and generates an estimated Apollo profit for each scenario. This chart is almost identical to the chart at the conclusion of the Bivens Report, except that it includes as a fixed cost the $1.6 million license fee paid to Apollo because that fee was secured as collateral in the ASA and would eventually require repayment to Comerica. Thus, for each scenario, the McLean Report takes the estimated gross sales revenues, subtracts the advertising agency and Heritage commissions, and then subtracts production costs fixed at $4.5 million, station compensation costs, tape distribution, rating research, promotion and marketing, bonus payments to Heritage, if any, and the license fee. The McLean Report thus concludes that in Scenario One, if Western had not produced a competing show, Apollo would have turned a profit of $718,250, but that in Scenario Five, assuming Western unfairly produced an infringing show, and retained both its primary clearances, and its up-front advertisers, Apollo would not have made a profit, but rather would have lost $2,684,600. The Bivens Report includes an attachment stating that during the 2002/2003 season, the Apollo Show actually earned $7,944,255 in gross sales and $6,752,617 in

17

adjusted gross sales after deducting the advertising agency commission. This attachment does not calculate the actual net profits of the Apollo Show for that season.

The McLean Report also attempts to calculate the value of a license fee that would have resulted from hypothetical negotiations between Apollo and Western during September 2002. This calculation assumes a willing licensor (Apollo) and licensee (Western) negotiating a one-year non-exclusive Trademark license with no provisions for sharing of creative control.[5] The McLean Report considers prior exclusive Trademark license fees ranging from $650,000 to $1.6 million, as well as two Apollo offers, and one Western offer, that were part of the unsuccessful license renewal process in the spring and summer of 2002, which ranged from $750,000 to $1 million. Based on these figures, the McLean Report concludes that $750,000 to $1 million should be the "starting range" for the negotiation.[6] The Report then adjusts these figures up and down using fifteen evidentiary factors used to determine reasonable royalty rates in patent disputes, known as the "Georgia Pacific Factors." See Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). After applying these factors, the McLean Report concludes that

_____

[5] The license is non-exclusive in this framework because it is assumed that Heritage has already been granted a license.

[6] It is worth noting, however, that all of the figures McLean uses to calculate the appropriate starting range for a negotiation are the figures for past exclusive license offers, not the non-exclusive license that would be negotiated in McLean's hypothetical.

the hypothetical negotiation for a license would produce a fee of $750,000.

Plaintiff's Claims and Supplemental Disclosures

Apollo seeks damages under eight causes of action. First, it brings a claim of infringement of federally registered trademarks under the Lanham Act, 15 U.S.C. § 1114(1). Second, Apollo claims false designation of origin and unfair competition pursuant to the Lanham Act, 15 U.S.C. § 1125(a). Third, Apollo claims dilution of a famous trademark pursuant to the Lanham Act, 15 U.S.C. § 1125(c). Fourth, Apollo alleges that Western engaged in deceptive acts and practices under New York statutory law, N.Y. G.B.L. § 349. Fifth, Apollo claims trademark dilution under New York statutory law, N.Y. G.B.L. § 360-1. Sixth, Apollo claims trademark infringement under New York common law. Seventh, Apollo claims unfair competition under New York common law. Eighth, Apollo alleges a breach of the duty of good faith and fair dealing.

In an undated supplemental disclosure pursuant to Rule 26(a)(1)(C), Fed. R. Civ. P. ("Disclosure"), Apollo stated that the damages it suffered from Western's infringement "include, inter alia, in addition to the Apollo Foundation's claim for injunctive relief, compensatory, exemplary and punitive damages and attorneys' fees and costs." The Disclosure states that the computation of damages is detailed in the two expert reports, and that those reports are based on four computations: (1) revenues

19

received by Western as a result of its infringement; (2) other
benefits gained by Western; (3) profits lost by Apollo; and (4)
the outcome of a hypothetical license negotiation between Apollo
and Western to approximate the value of Western's unlicenced
activities. The Disclosure also states that Apollo seeks damages
for lost sponsorship income from McDonald's, as well as punitive
damages.

Procedural History

Apollo initiated this case on December 19, 2002, and filed
an amended complaint ("Complaint") on February 11, 2003. By
Order of March 18, 2003, no further amendments to the pleadings
were permitted after May 2. On June 21, 2004, Western's motion
to dismiss or stay Apollo's action in favor of arbitration was
denied. Apollo Theater Found., Inc. v. Western Int'l
Syndication, No. 02 Civ. 10037 (DLC), 2004 WL 1375557, at *4
(S.D.N.Y. June 21, 2004). After the completion of discovery and
the settlement of this case as to defendant ICTG, Apollo and
Western both filed motions for partial summary judgment; Apollo
simultaneously filed a motion for leave to file a second amended
complaint.

Western moves for summary judgment on each of Apollo's
damages theories as identified in the Disclosure, and also
asserts that the First Amendment protects it from a judgment of

liability under the Lanham Act.[7]  Apollo moves for summary
judgment on all eight of Western's affirmative defenses.  Apollo
also moves for leave to file a second amended complaint in order
to add a claim for breach of fiduciary duty against Western.

## DISCUSSION

Summary judgment may not be granted unless all of the
submissions taken together "show that there is no genuine issue
as to any material fact and that the moving party is entitled to
a judgment as a matter of law."  Rule 56(c), Fed. R. Civ. P.  The
moving party bears the burden of demonstrating the absence of a
material factual question, and in making this determination the
court must view all facts in the light most favorable to the non-
moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247

---

[7]  In its opposition to Western's summary judgment motion,
Apollo observes that Western's motion only addresses Apollo's
claims for trademark infringement arising under the Lanham Act.
Western's reply states that the Disclosure and Apollo's expert
reports do not state under what causes of action Apollo seeks
damages for lost profits and sponsorship fees, and that
Western's motion therefore applies to Apollo's damages claims
under all causes of action.

The Disclosure states that "[t]he damages resulting from the
Defendants' infringement, false designation of origin, unfair
competition, trademark dilution, deceptive acts and practices,
and breach of the duty of good faith and fair dealing . . .
include, inter alia, . . . compensatory, exemplary, and punitive
damages . . . ."  The Disclosure goes on to state that the
"computation of damages" is contained in the Bivens and McLean
Reports.  It appears therefore that Apollo intended these damages
calculations to apply to each of its claims and that Western's
motion is similarly addressed to Apollo's right to recover
damages under each of its claims.  Western does not dispute that
its First Amendment argument is asserted as a defense solely to
Apollo's Lanham Act claims.

(1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  When
the moving party has asserted facts showing that the non-movant's
claims cannot be sustained, the opposing party must "set forth
specific facts showing that there is a genuine issue for trial,"
and cannot rest on the "mere allegations or denials" of the
movant's pleadings.  Rule 56(e), Fed. R. Civ. P.; <u>accord</u> <u>Burt</u>
<u>Rigid Box, Inc. v. Travelers Property Cas. Corp.</u>, 302 F.3d 83, 91
(2d Cir. 2002).  Where summary judgment motions, or portions
thereof, are unopposed, the court must still determine whether
the moving party is entitled to judgment as a matter of law.  <u>See</u>
<u>Vermont Teddy Bear Co. v. 1-800 Beargram Co.</u>, 373 F.3d 241, 242
(2d Cir. 2004).


<u>Lanham Act</u>

The Lanham Act ("Act") provides:

Any person who shall, without the consent of the
registrant--
(a) <u>use in commerce</u> any reproduction, counterfeit,
copy, or colorable imitation of <u>a registered mark</u> in
connection with the . . . distribution, or advertising
of any goods or services on or in connection with which
such use is <u>likely to cause confusion</u>, or to cause
mistake, or to deceive . . .
shall be liable in a civil action by the registrant for
the remedies hereinafter provided.

15 U.S.C. § 1114(1) (emphasis supplied).  The Act also provides

for liability for

[a]ny person who, on or in connection with any goods or
services . . . uses in commerce any word, term, [or]
name, . . . or any <u>false designation of origin</u>, false
or misleading description of fact, or false or
misleading representation of fact, which--
(A) <u>is likely to cause confusion</u>, or to cause mistake,
or to deceive as to the affiliation, connection, or

22

association of such person with another person, or <u>as to the origin, sponsorship, or approval</u> of his or her goods, services, or commercial activities by another person, or
(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities . . . .

15 U.S.C. § 1125(a) (emphasis supplied).  <u>See also</u> <u>L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co.</u>, 79 F.3d 258, 262 (2d Cir. 1996).  Section 1125(a) provides a statutory remedy to a party injured by a competitor's "false designation of origin" of its product, "whether or not the party has secured a federally registered trademark."  <u>Forschner Group, Inc. v. Arrow Trading Co.</u>, 124 F.3d 402, 407 (2d Cir. 1997).  <u>See also</u> <u>L. & J.G. Stickley</u>, 79 F.3d at 262.  The Act also provides protection against the dilution of a famous trademark.  15 U.S.C. § 1125(c)(1).

The Act provides for damages for violations of these three provisions as follows:

When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, . . . subject to the principles of equity, to recover (1) <u>defendant's profits</u>, (2) <u>any damages sustained by the plaintiff</u>, and (3) the costs of the action.  The court shall assess such profits and damages or cause the same to be assessed under its direction.  In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount.  <u>If the court shall find that the amount of the recovery based on profits is either</u>

> inadequate or excessive the court may in its discretion
> enter judgment for such sum as the court shall find to
> be just, according to the circumstances of the case.
> Such sum in either of the above circumstances shall
> constitute compensation and not a penalty.  The court
> in exceptional cases may award reasonable attorney fees
> to the prevailing party.

15 U.S.C. § 1117(a) (emphasis supplied).  Where a violation

includes infringement of a registered mark, a plaintiff may

obtain treble damages.  15 U.S.C. § 1117(b).


Measuring Trademark Infringement Damages

There are at least five, non-mutually exclusive methods for

measuring monetary recovery in a trademark infringement action.

They are an award to the plaintiff

> 1.  . . . measured by defendant's profits, either as a
> way of measuring plaintiff's loss or under an unjust
> enrichment theory;
> 2.  . . . measured by its actual business damages and
> losses caused by the wrong;
> 3.  . . . measured by its own loss of profits caused by
> the wrong;
> 4.  . . . of punitive damages in addition to actual
> damages, for the purpose of punishing defendant; and
> 5.  . . . of reasonable attorney's fees incurred in
> prosecution.

J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition

§ 30:57 (4th ed. 2004) ("McCarthy on Trademarks").  See also Aini

v. Sun Taiyang Co., No. 96 Civ. 7763 (LAK), 1997 WL 576027, at *2

(S.D.N.Y. Sept. 15, 1997).  As described below, in appropriate

circumstances, an implied royalty may also be a measure of

damages.

Multiple measures of monetary recovery exist in part because

a defendant need not turn a profit from infringing a trademark in

order for the plaintiff to suffer damages from the infringement.
For example, "a defendant may have failed to earn profits because
of the poor quality of its product or its own inefficiency."
Tough Traveler, Ltd. v. Outbound Prods., 60 F.3d 964, 968 (2d
Cir. 1995) (citation omitted).  Likewise, a plaintiff need not
demonstrate that it would have earned a profit on its trademarked
goods or services but for the infringing activity of the
defendant; even if a money-losing enterprise cannot demonstrate
"lost profits," it still may be damaged by trademark
infringement.  "While damages directly measure the plaintiff's
loss, defendant's profits measure the defendant's gain. . . .
[T]his is not to be confused with plaintiff's lost profits, which
have been traditionally compensable as an element of plaintiff's
damages."  George Basch Co. v. Blue Coral, Inc., 968 F.2d 1532,
1540 (2d Cir. 1992) (emphasis supplied).[8]  See also McCarthy on
Trademarks § 30:72 ("Plaintiff's damages should be measured by
the tort standard under which the infringer-tortfeasor is liable
for all injuries caused to plaintiff by the wrongful act . . .
.").  Indeed, it is possible that trademark infringement could
damage a plaintiff where neither the defendant nor the plaintiff
earns a profit, particularly where "confusion may cause

---

[8]  At least one commentator has noted the "great deal of
semantic confusion" surrounding the award of monetary recovery
for trademark infringement, stating that "'profits' is often used
without revealing whose profits -- plaintiff's or infringer's --
are being discussed."  McCarthy on Trademarks § 30:57.

purchasers to refrain from buying either product." <u>Tough
Traveler</u>, 60 F.3d at 968.

<u>Western's Six Grounds for Partial Summary Judgment</u>

Western seeks partial summary judgment on five grounds
connected to the measure of damages that would be available to
Apollo should it prevail on the merits. It also seeks partial
summary judgment on the question of whether its use of the words
"Showtime" and "Showtime in Harlem" is protected by the First
Amendment as artistic expression.

### 1. Western's Profits

Calculating profits as a measure of damages in trademark
cases is an endeavor to determine a party's "net profits."
<u>Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.</u>, 885 F.2d 1,
7 (2d Cir. 1989). <u>See also</u> <u>Murphy Door Bed Co. v. Interior Sleep
Sys., Inc.</u>, 874 F.2d 95, 103 (2d Cir. 1989). Where the
defendant's profits are at issue, after the plaintiff has
established the defendant's gross sales or revenues, the
defendant has the burden of establishing deductions from these
revenues for costs and expenses, including overhead. <u>Sweater
Bee</u>, 885 F.2d at 7. The defendant "must prove not only that it
has borne the particular cost or expense but also that the cost
or expense is attributable to its unlawful sales." <u>Id.</u>

Western has documented that its total revenue was
$5,177,104, and that its total costs were $6,669,901, not

including the loan renewal charge.  Even using the figures
generated by the Bivens Report on behalf of Apollo, Western's
computed gross revenue of $6,642,444 does not yield a profit.
Apollo does not oppose Western's summary judgment motion on this
point.  Therefore, judgment is entered in favor of Western on the
question of whether it earned a profit on "Showtime in Harlem"
during the 2002/2003 season.

    2.  Apollo's Lost Profits

    Calculating a plaintiff's lost profits also means "net
profits," although the calculation of <u>lost</u> profits necessarily
requires an approximation "by <u>estimating</u> revenue lost due to the
infringing conduct and subtracting what it <u>would have cost</u> to
generate that revenue."  <u>GTFM, Inc. v. Solid Clothing, Inc.</u>, 215
F. Supp. 2d 273, 305 (S.D.N.Y. 2002) (Cote, J.) (emphasis
supplied).  <u>Cf.</u> <u>Murphy Door</u>, 874 F.2d at 103.  Although the
amount of its damages must be demonstrated by the plaintiff with
specificity, <u>see</u> <u>Solid Clothing</u>, 215 F. Supp. 2d at 305, courts
may engage in "some degree of speculation" in the computation of
such damages, particularly where the defendant's infringing
conduct makes such computation difficult.  <u>Burndy Corp. v.
Teledyne Indus., Inc.</u>, 748 F.2d 767, 771 (2d Cir. 1984).

    The Bivens and McLean Reports ("Reports") attempt to
quantify the profits Apollo lost as a result of Western's

competing program.[9]  Western seeks to show that the Reports
failed to account for certain costs that would have denied the
Apollo Show a profit.

Both Reports assume that gross advertising sales for the
Apollo Show in "Scenario One," without a competing show in the
2002/2003 season, would have totaled $11 million.  After
identified costs are subtracted,[10] this yields a net profit of
$845,000, which, after the 15% of net profit payment to the
producer, dePasse Entertainment, yields a "But-For Lost Profit"
of $718,250.

Western challenges the calculation of net profits, claiming
that the Reports ignore two costs that must be deducted from
revenue, to wit, it argues that the actual approved budget for
the 2002/2003 Apollo Show was $5,372,961, not $4.5 million, and
that Apollo is responsible for various financing expenses

_____

[9]  Through the Disclosure, as well as the Reports, Apollo is
seeking compensation for lost profits, as opposed to actual
damages suffered regardless of whether the Apollo Show would have
earned a profit.

[10]  According to the Reports, after subtracting the 15%
contractual advertising agency commission on gross sales, and the
20% contractual Heritage commission on the remaining adjusted
gross sales, the net revenue for the Apollo Show would have been
$7,480,000.  Both Reports calculate total costs of the Apollo
Show by adding the Heritage Agreement's capped production cost of
$4.5 million to anticipated station compensation costs of
$100,000, tape distribution costs of $75,000, Neilsen media
research costs of $125,000, promotion and marketing costs of
$200,000, and a contractual bonus payment to Heritage of $35,000,
for total costs of $5,035,000.  The revised McLean Report then
adds the license fee payment from Heritage to Apollo of $1.6
million to the costs section of the report, presumably because it
was recoverable by Comerica, raising the total costs to
$6,635,000.

connected to the loan from Comerica. If Apollo is liable for the actual budget of the Apollo Show, this represents an additional cost of $872,961 that would wipe out the hypothetical net profit of $718,250. If Apollo is liable for the fees and expenses associated with the loan,[11] Apollo would be responsible for an additional $882,146 in loan financing costs that also would wipe out the hypothetical net profit. In essence, Apollo and Western disagree about whether the ASA and Heritage Agreement make Apollo liable for the extra budget costs and loan financing costs, and thus, whether those agreements require a modification of the calculations by Apollo's two experts.

It is a well-established principle of contract construction that "all provisions of a contract be read together as a harmonious whole, if possible." Perreca v. Gluck, 295 F.3d 215, 224 (2d Cir. 2002) (citation omitted). See also Empire Props. Corp. v. Mfrs. Trust Co., 43 N.E.2d 25, 28 (N.Y. 1942). The language of the ASA unambiguously grants Comerica a first priority security interest in all of Apollo's revenues from the Apollo Show. It also indicates that for the purposes of loan repayment, all consents and approvals required to be given by Apollo under the Heritage Agreement are unconditionally given or

---

[11] As set out in the Loan and Security Agreement, Borrowing Certificate, and Completion Guarantee, the expenses associated with the loan include a loan fee of $245,000, an interest reserve of $400,000, a production completion guaranty of $139,459, and a loan broker fee of $97,687. The production completion guaranty of $139,459 and the loan broker fee of $97,687 were paid out of the loan proceeds.

waived, including approval of the budget for production expenses. The self-evident function of this provision is to prevent Apollo from shielding a portion of its revenue from collection by Comerica by contending that Apollo did not approve a budget that was larger than that provided for in the Heritage Agreement.

Apollo claims that the provision of the Heritage Agreement that states that the production budget shall not be more than $4.5 million limits the amount of production budget expenses that Comerica can recoup from Apollo. This interpretation is fundamentally at odds with the ASA's clear language that Comerica retains a first priority security interest in all of Apollo's revenues from the Apollo Show. Moreover, the provision of the Heritage Agreement on which Apollo relies states that the budget may be set forth "with such changes as [Apollo], Heritage and the Producer shall mutually agree," thereby acknowledging that the budget limits could be altered on consent.

Apollo argues that the budget could not have been "approved" without the consent of the Producer, dePasse, and that the revised budget was not presented until January 3, 2003 in the Loan Agreement between Heritage and Comerica, and therefore also could not have been "approved." These arguments miss the mark because the issue is not whether the budget had the actual approval of Apollo, but whether Apollo waived its right to assert a lack of approval as a defense to collection by Comerica. For this reason, Apollo is responsible for the actual production budget vis-a-vis Comerica, regardless of whether it actually

approved the budget.  Consequently, the actual budget of $5,372,961 must be included in the cost calculation, which changes Apollo's "But-For Lost Profit" to a net loss of ($27,961).[12]

Similarly, Apollo is responsible for financing fees.  The ASA states that the collateral from Apollo that secured the Comerica loan included "all fees, costs, expenses, interest, and other charges of the Bank" connected with the loan.  This language, in conjunction with the ASA's provision granting Comerica a first priority security interest in all of Apollo's revenues from the Apollo Show, unambiguously indicates that Comerica could collect Apollo Show revenues from Apollo in order to cover the financing fees associated with the loan.

Apollo argues that an ambiguity exists because the same provision of the ASA states that "Distribution Expenses" shall also be recoupable by Comerica against Apollo, and expressly incorporates the definition of "Distribution Expenses" from the Heritage Agreement, such that they "shall not include any interest or financing charges."  This reference to Distribution Expenses does not create an ambiguity.  Prohibiting "Distribution

---

[12]   The net loss figure is derived by subtracting the additional budgetary expenditure of $872,961 from Apollo's net profit of $845,000.  It is subtracted from Apollo's net profit, as opposed to its "But-For Lost Profit" of $718,250, because the "But-For Lost Profit" figure was generated by subtracting 15% of the net profit as a commission payment to the Producer, dePasse Entertainment.  The Producer is not entitled to that commission when the net profit is a negative number, and so the additional budgetary expenditure should be subtracted from Apollo's net profit of $845,000.

Expenses" from including financing costs does not mean that the ASA cannot include financing costs in Apollo's collateral where such costs are listed in addition to Distribution Expenses.

Apollo also argues that two of the financing costs Western seeks to include as costs for Apollo, namely, the production completion guaranty of $139,459, and the loan broker fee of $97,687, are not financing costs "of the Bank," because they were paid to third parties. Apollo concludes, therefore, that these figures should not be included in the total financing charges for which Apollo is responsible. This argument neglects to consider that these fees, which were paid directly out of the loan proceeds, are recoupable by Comerica as part of the "Obligations" of Heritage under the Loan Agreement. Because the ASA grants Comerica an interest in all of Apollo's revenues from the Apollo Show to satisfy the "Obligations" of Heritage, these fees are properly considered costs against Apollo. Thus, because the loan fee of $245,000, the interest reserve of $400,000, the production completion guaranty of $139,459, and the loan broker fee of $97,687 represent costs for which Apollo is responsible, Apollo's "But-For Lost Profit" changes to a cumulative net loss of ($910,107).

As a matter of law, Western is therefore entitled to summary judgment on whether Apollo's projected lost profits may represent a measure of damages, because there is no genuine issue of material fact regarding whether Apollo would have earned a profit on the Apollo Show. Even under the most favorable hypothetical

in Apollo's expert reports, when additional, necessary costs are taken into account, there is no evidence to support the conclusion that Apollo would have earned a net profit.

### 3. Apollo's Reasonable Royalty Claim

One seldom-used method for computing trademark damages is a royalty. A royalty is a measure of compensation for past infringement based on the reasonable value of a license to use the trademark that the infringing defendant should have paid. See McCarthy on Trademarks § 30:85. Use of a royalty theory of recovery is generally limited to situations where the parties have had a trademark licensing relationship that facilitates computation of the reasonable royalty damages. "[W]hen the courts have awarded a royalty for past trademark infringement, it was most often for continued use of a product beyond authorization, and damages were measured by the license the parties had or contemplated." A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 166 F.3d 197, 208-09 (3d Cir. 1999). In the context of copyright law, the Second Circuit has approved of the use of a royalty measure even where the copyright owner could not show lost income. On Davis v. The Gap, Inc., 246 F.3d 152, 166 (2d Cir. 2001). The royalty award is appropriate to prevent the defendant from taking a copyright for free. Id.

A royalty for past trademark infringement may be an appropriate measure of damages in this case, because Apollo and Western have a history of negotiating and concluding licensing

agreements governing the Trademark.  As the McLean Report
indicates, it is possible to estimate what license fee Western
and Apollo would have arranged for a non-exclusive license based
on adjustments to earlier fees paid by Western.

Western contends that a reasonable royalty measure of
damages is inappropriate because it constitutes a compulsory
license.  Western confuses the notion of a "compulsory license"
for <u>future</u> trademark usage with a reasonable royalty as a measure
of damages for <u>past</u> trademark infringement.  A compulsory license
essentially permits "the infringer to continue by paying a court-
determined royalty to the trademark owner," and is "not a proper
remedy."  <u>McCarthy on Trademarks</u> § 30:85.  By contrast, a
reasonable royalty is "compensation for past acts of
infringement," and may represent "a more workable measure of
damages than an accounting of profits."  <u>Id.</u>

Western also contends that a reasonable royalty would
constitute an impermissible penalty because Apollo already
received an exclusive license fee of $1.6 million from Heritage,
and Heritage did not seek a reduction in the license fee due to
the existence of a competing program, suggesting that Apollo
cannot demonstrate that it was financially damaged.  Western
neglects to consider that it did, in fact, produce a competing
show that, if a jury were to find trademark infringement, would
have required a non-exclusive license to produce.  In this way,
Western received the benefit of producing a program that traded
on the goodwill of Apollo's Trademark without compensating Apollo

for the use of that Trademark.  Moreover, to the extent that a
jury were to find that Apollo lost advertising sales to Western
as a result of the infringement -- a conclusion that is supported
by the Bivens and McLean Reports -- Western's <u>de facto</u>
unauthorized use of a license not only unjustly enriched Western,
but also damaged Apollo.  The Heritage license was premised on an
exclusive use of the Trademark.  Contrary to Western's view, what
constitutes "damages" includes, as the Lanham Act states, "<u>any</u>
damages sustained by the plaintiff."  15 U.S.C. § 1117(a)
(emphasis supplied).

### 4.  Apollo's Lost Sponsorship from McDonald's

Apollo seeks damages for a purported loss of a sponsorship
payment in 2003 from the McDonald's Corporation ("McDonald's").
Apollo has shown that for some time prior to 2002, McDonald's
sponsored a portion of the Apollo Show featuring child performers
who had been selected through local competitions held by Western
and funded by McDonald's in shopping malls across the country.
When the defendants lost the license to produce and distribute
the Apollo Show, McDonald's paid Apollo $200,000 for the first
time to permit the winners of the 2002 tour to appear on the
2002/2003 Apollo Show.  In the past, Apollo's only revenue from
McDonald's came from advertising payments.  McDonald's did not
sponsor a child talent search tour in 2003, and there is no
evidence that Apollo or Heritage sought to undertake Western's

role in the tour and to join with McDonald's in 2003 to continue the tour.

Apollo cannot obtain damages in the form of a loss in 2003 of a payment by McDonald's because Apollo has not offered any testimony indicating that Apollo or Heritage planned or attempted to conduct a similar child talent-search tour in 2003, nor has it offered testimony from McDonald's indicating that its abandonment of the tour had anything to do with the existence of two competing shows. Neither Apollo nor Western took any discovery of McDonald's. Western is entitled to summary judgment on this theory of damages.

### 5. Apollo's Claim for Corrective Advertising

Apollo acknowledges that it has not engaged in a corrective advertising campaign. It confirms that it has dropped this claim for damages.

### 6. First Amendment

Western argues that it is entitled to summary judgment on its defense that the First Amendment protects its use of the program title words "Showtime" and "Showtime in Harlem." In reviewing Lanham Act claims addressed to the titles of creative works, courts balance expressive rights against the right to prevent confusion and deception using the test articulated in Rogers v. Grimaldi, 875 F.2d 994, 999 (2d Cir. 1989). Under the Rogers test, trademark infringement occurs where the alleged

36

infringer's usage has "no artistic relevance" to the underlying work or, if some artistic relevance is present, the title "explicitly misleads as to the source or the content of the work." Rogers, 875 F.2d at 999. See also McCarthy on Trademarks § 10:22. Where a First Amendment right is at stake, "the finding of likelihood of confusion must be particularly compelling to outweigh the First Amendment interest recognized in Rogers." Twin Peaks Productions, Inc. v. Publ'ns Int'l, Ltd., 996 F.2d 1366, 1379 (2d Cir. 1993).

The Rogers test does not apply, however, "to misleading titles that are confusingly similar to other titles. The public interest in sparing consumers this type of confusion outweighs the slight public interest in permitting authors to use such titles." Rogers, 875 F.2d at 999 n.5. Determining whether a title is misleading may require an inquiry that extends beyond the title itself. "It is a fair question whether a title that might otherwise be permissible under Rogers violates the Lanham Act when displayed in a manner that conjures up a visual image prominently associated with the work bearing the mark that was copied." Twin Peaks Productions, 996 F.2d at 1380.

Western has not shown that it is entitled to summary judgment on a First Amendment defense. Even if Western were able to show that its use of the titles "Showtime" and "Showtime in Harlem" carried artistic relevance, there are questions of fact as to whether those titles constituted "misleading titles that are confusingly similar to" the Trademark, "It's Showtime at the

Apollo."  Moreover, the use of the titles "Showtime" and

"Showtime in Harlem" as part of a television program employing

numerous visual images and other slogans strongly associated with

the Trademark also creates a triable issue of fact as to whether

the words were displayed "in a manner that conjures up a visual

image prominently associated with" the Trademark.  <u>Id.</u>


<u>Plaintiff's Motion To Strike Western's Affirmative Defenses</u>

Apollo has also moved to strike Western's affirmative

defenses.

> Where a plaintiff uses a summary judgment motion, in
> part, to challenge the legal sufficiency of an
> affirmative defense -- on which the defendant bears the
> burden of proof at trial -- a plaintiff may satisfy its
> Rule 56 burden by showing that there is an absence of
> evidence to support an essential element of the non-
> moving party's case.

<u>Fed. Deposit Ins. Corp. v. Giammettei</u>, 34 F.3d 51, 54 (2d Cir.

1994) (citation omitted).  <u>See also</u> <u>Ginsberg v. Healey Car &</u>

<u>Truck Leasing, Inc.</u>, 189 F.3d 268, 270 (2d Cir. 1999).

> While whatever evidence <u>there is</u> to support an
> essential element of an affirmative defense will be
> construed in a light most favorable to the non-moving
> defendant, there is no express or implied requirement
> in Rule 56 that the moving party support its motion
> with affidavits or other similar materials <u>negating</u> the
> opponent's claim.

<u>Giammettei</u>, 34 F.3d at 54 (citation omitted) (emphasis in

original).

Apollo has moved for partial summary judgment to strike most of the affirmative defenses asserted by Western.[13]  These defenses are: unclean hands, laches, estoppel, waiver, and abandonment of the Trademark by failure to police and lack of quality control.[14]

### 1.  Unclean Hands

Apollo has shown that it is entitled to summary judgment on Western's affirmative defense of unclean hands.  The doctrine of unclean hands "is based on the principle that since equity tries

---

[13]  Western's Answer also advances the affirmative defense that the Trademark is "not valid or enforceable," apparently to preserve Western's right to argue that Apollo has not carried its burden of proof on its Lanham Act claims.  The Answer also raises an affirmative defense of "failure to state a claim," an argument that Western has never pressed in this litigation.

Finally, the Answer asserts an affirmative defense that Western owns the copyright to the episodes of the Apollo Show that were produced while Western was the Trademark's licensee.  "American courts uniformly hold that the title alone of a literary work cannot be protected by copyright law."  McCarthy on Trademarks § 10:34.  It is well-settled in this Circuit that "[a] title cannot be copyrighted."  Arnstein v. Porter, 154 F.2d 464, 474 (2d Cir. 1946).  See also Warner Bros. Pictures v. Majestic Pictures, 70 F.2d 310, 311 (2d Cir. 1934).  Owning the copyright on a work, therefore, "does not carry with it the exclusive right to use of the title on any other work," resulting in the conclusion that "the only legal protection for literary titles lies in the field of trademarks and unfair competition, where likelihood of confusion is the test."  McCarthy on Trademarks § 10:34 (emphasis supplied).  Consequently, Western's copyright ownership does not permit it to use the Trademark beyond the terms of its license, and this affirmative defense as well as the other two just described are irrelevant.

[14]  Some of these affirmative defenses are equitable and therefore are only relevant to the extent Apollo seeks equitable relief.  Western's Answer describes the abandonment defenses as "ratification."

to enforce good faith in defendants, it no less stringently demands the same good faith from the plaintiff." Dunlop-McCullen v. Local 1-S, AFL-CIO-CLC, 149 F.3d 85, 90 (2d Cir. 1998) (citation omitted). In New York, courts in equity "apply the maxim requiring clean hands where the party asking for the invocation of an equitable doctrine has committed some unconscionable act that is directly related to the subject matter in litigation and has injured the party attempting to invoke the doctrine." PenneCom, B.V. v. Merrill Lynch & Co., 372 F.3d 488, 493 (2d Cir. 2004) (citation omitted). Misconduct that is "unrelated to the claim to which it is asserted as a defense," however, "does not constitute unclean hands." Dunlop-McCullen, 149 F.3d at 90 (citation omitted). Thus, "the defense of unclean hands applies only with respect to the right in suit." Id. (citation omitted). These principles of the doctrine of unclean hands apply with equal force to Lanham Act claims. Warner Bros., Inc. v. Gay Toys, Inc., 724 F.2d 327, 334 (2d Cir. 1983).

Western's attempts to resist Apollo's motion to strike this defense are unsuccessful, because the six grounds it asserts either are not "directly related to the subject matter in litigation," PenneCom, 372 F.3d at 493, or do not represent the type of "unconscionable" acts that could give rise to the defense. Id. Western first claims that Apollo failed to negotiate exclusively and in good faith over a two week period with Western to renew the license, in breach of the License Renewal; that Apollo led Western to believe that it was

negotiating in accordance with the good faith provision until the end of July 2002; and that Apollo waited until near the beginning of the 2002/2003 season to inform Western that it was not renewing the license.  Each of these three accusations relates to performance of alleged obligations under the License Renewal, which is not the subject matter of this lawsuit; they do not relate to the unauthorized use of the Trademark itself.  For example, Western is not alleging that Apollo originally obtained the Trademark in some deceitful way.  Thus, these three claims are not sufficiently related to the subject matter in litigation.

Likewise, Western's claim that Apollo unfairly marketed the Apollo Show as a continuation of the "Western/ICTG series" is not related to Apollo's acquisition of the rights it is asserting against Western in this case, nor is Western's claim that Apollo misappropriated information belonging to Western that was allegedly confidential and shared it improperly during its negotiations with Heritage.  Finally, Western's claim that Apollo changed the title of its show from "It's Showtime at the Apollo" to "Showtime at the Apollo" for the 2002/2003 season in order to increase the similarity to the allegedly infringing mark suffers from a complete absence of evidence that the minor name-change was "unconscionable."[15]

---

[15]  Western cites a Ninth Circuit case that noted without further discussion a district court's finding of unclean hands where the plaintiff "had changed his logo to make it virtually identical with that of" the defendant's logo.  <u>Adray v. Adry-Mart, Inc.</u>, 76 F.3d 984, 991 (9th Cir. 1995).  Apollo's minor alteration in the title of its program only has significance

2.  Laches, Estoppel, and Waiver

To succeed on the equitable defense of laches, a defendant must "establish both plaintiff's unreasonable lack of diligence under the circumstances in initiating an action, as well as prejudice from such a delay." Veltri v. Bldg. Serv. 32B-J Pension Fund, 393 F.3d 318, 326 (2d Cir. 2004) (citation omitted).  An inquiry regarding the availability of the laches defense turns on fairness: "A party asserting a laches defense must show that the plaintiff has inexcusably slept on its rights so as to make a decree against the defendant unfair." Merrill Lynch Inv. Managers v. Optibase, Ltd., 337 F.3d 125, 132 (2d Cir. 2003) (citation omitted).  In the context of trademark infringement, "where a person entitled to exclusive use of a trademark is guilty of unreasonable delay in asserting his rights against an infringer . . . , a court of equity has the discretionary power to deny injunctive relief or an accounting." ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic and Sports Physical Therapy P.C., 314 F.3d 62, 67 (2d Cir. 2002) (citation omitted).  Laches implies "passive consent," id., such that "courts construe the plaintiff's unreasonable delay to imply consent to the defendant's conduct." Id. at 68.

The doctrine of equitable estoppel "is properly invoked where the enforcement of the rights of one party would work an

---

because Western chose a title that so closely matched Apollo's long-established title.  In these circumstances, Western cannot escape liability by invoking the doctrine of unclean hands.

injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." <u>Veltri</u>, 393 F.3d at 326. The three elements defendants must establish to invoke equitable estoppel are: "(1) a misrepresentation by the plaintiff, (2) reasonable reliance by the defendant, and (3) prejudice." <u>Id.</u> Silence may constitute an affirmative misrepresentation for purposes of equitable estoppel where there is a duty to speak. <u>See</u> <u>In re Vebeliunas</u>, 332 F.3d 85, 94 (2d Cir. 2003). "Under New York law, a claim of waiver requires proof of an intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it." <u>Capitol Records, Inc. v. Naxos of America, Inc.</u>, 372 F.3d 471, 482 (2d Cir. 2004).

Western claims that it and ICTG produced and distributed the Apollo Show for ten years under a license from Apollo, and that during that period, Apollo never claimed any ownership interest in the format, elements, or content of the Apollo Show. Western claims that Apollo should therefore be estopped from asserting an interest in that format, and should be deemed to have waived and unreasonably delayed the assertion of those rights. Western has not shown that Apollo was required to spell out to its licensee all of the elements of its intellectual property rights. That Western may have received greater rights through its license than it now asserts it understood it had received, does not constitute waiver, laches, or estoppel. In any event, the central right asserted by Apollo in this case is its right in the Trademark.

Any rights emanating from the format, elements, or content of the Apollo Show are asserted as subsidiary to and supportive of Apollo's rights to the title of its show. Thus, Western's affirmative defenses of laches, equitable estoppel, and waiver must be stricken.

### 3. Abandonment by Failure To Police or Lack of Quality Control

To establish the defense of abandonment by failure to police a trademark, "it is necessary to show either the owner's intent to abandon the mark, or a course of conduct on the part of the owner causing the mark to become generic or lose its significance as a mark." Hermes Int'l v. Lederer de Paris Fifth Avenue, Inc., 219 F.3d 104, 110 (2d Cir. 2000). A defendant bears a "high burden of proof" to show abandonment through failure to police. Warner Bros., 724 F.2d at 334 (citation omitted).

The owner of a trademark who licenses the use of the trademark is "obliged to maintain some control over the quality of the licensed property as an incident of valid licensing or risk abandonment of its mark." Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc., 277 F.3d 253, 259 (2d Cir. 2002). Nevertheless, "use of a mark by a person while such person was a licensee builds up no rights in the mark as against the licensor." Id. (citation omitted). For example, "a licensee should not be permitted to rely upon its own conduct of selling non-complying and inferior goods and services as a basis for

44

challenging the adequacy of quality control exercised by the trademark owner." <u>McCarthy on Trademarks</u> § 18:63.

The only evidence proffered by Western that Apollo failed to police the Trademark is the unlicensed publication of two historical books about the Theater: a 1983 book, republished in 1993, by one of Apollo's experts, Ted Fox, entitled <u>Showtime at the Apollo: The Story of Harlem's World Famous Theater</u>, and a 1990 book by Ralph Cooper, Sr., the creator of the amateur night hosted at the Theater, entitled <u>Amateur Night at the Apollo</u>.  The publication of these two books, is insufficient as a matter of law to establish that Apollo intended to abandon the Trademark or engaged in a "course of conduct" causing the mark to become generic or lose its significance as a mark.

Western also bases its defense of abandonment on Apollo's alleged failure to engage in any quality control with respect to Western, and on the lack of quality control provisions in any licensing agreements between Apollo and Western.  Western offers evidence that Apollo executives believed that Western's production values were below the standards of the Trademark.[16] As a licensee, Western is estopped from asserting abandonment on the ground that Apollo failed to police sufficiently Western's use of the mark.  Similarly, there is no requirement that formal quality control provisions be included in licensing contracts.

---

[16]  Western's reluctance to grant Apollo more control over the format of the Apollo Show appears to have been a significant obstacle preventing the renewal of the license for the 2002/2003 season.

Western has not presented evidence sufficient to support the conclusion that Apollo abandoned the Trademark by failing to police its mark.

<u>Plaintiff's Motion for Leave To Amend Complaint</u>

Apollo has moved to amend its Complaint. Rule 16 permits the Court to enter "a scheduling order that limits the time . . . to amend the pleadings." Rule 16(b), Fed. R. Civ. P. "A schedule shall not be modified except upon a showing of good cause and by leave of the district judge . . . ." <u>Id.</u> Rule 16 "is designed to offer a measure of certainty in pretrial proceedings, ensuring that at some point both the parties and the pleadings will be fixed." <u>Parker v. Columbia Pictures Indus.</u>, 204 F.3d 326, 340 (2d Cir. 2000) (citation omitted). Disregarding the instructions of a scheduling order "would undermine the court's ability to control its docket, disrupt the agreed-upon course of the litigation, and reward the indolent and the cavalier. Rule 16 was drafted to prevent this situation." <u>Id.</u> (citation omitted). Rule 16 requires a different analysis than that undertaken in connection with a motion to amend under Rule 15 and its "standards may not be short-circuited by an appeal to those of Rule 15." <u>Id.</u> (citation omitted). "If we considered only Rule 15(a) without regard to Rule 16(b), we would render scheduling orders meaningless and effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure." <u>Id.</u> (citation omitted).

46

Apollo seeks to amend its complaint after the conclusion of all discovery to add a claim for breach of fiduciary duty. Both parties agree that Apollo must show both that there is good cause for the amendment, and that the amendment will not unduly prejudice Western.

Apollo claims that it has good cause for the amendment because "it was only on September 14, 2004, during the deposition of Mr. Sutton that the Apollo Foundation learned of the full extent of Western's bad faith and intentional abuse of its fiduciary position." The primary facts that Apollo asserts were newly discovered in the Sutton deposition are that Western did not provide financial information to Apollo that it was obligated by contract to provide, and that Western intended to distribute a competing show if it lost its Trademark license. Apollo also states that Western's expert reports and depositions, "all of which were provided in September 2004," further support these facts.

Apollo's good cause arguments are transparent. First, Apollo was aware that Western was not supplying financial information to Apollo that it was obligated by contract to provide at least as early as April 12, 2002.[17] Apollo believed

---

[17] An April 12, 2002 letter from Nicole A. Bernard, Senior Vice President of Apollo, to Western and ICTG, reads as follows:
> Apollo demands that Inner City and Western immediately
> provide the Apollo with (i) the overdue quarterly
> reports setting forth all royalties for each quarter fo
> the term of the License Agreement, as required under
> the Section 3c [sic] of the Original Agreement; (iii)
> [sic] the overdue quarterly reports of Net Receipts

long before September 2004 that Western intended to distribute a competing show if it lost its Trademark license. In its Complaint, Apollo alleged that Western informed television stations that it would be distributing its own program instead of the Apollo Show at the same time it was negotiating to renew the license with Apollo. Plainly, it was unnecessary for Apollo to wait until after the deposition of Mr. Sutton to raise a claim based on information within its control even before the initiation of this action.

Amending the pleadings to include a breach of fiduciary duty claim would be unduly prejudicial to Western. At the very least, it would require reopening expert discovery and further delay the long-postponed trial of this action. In sum, permitting Apollo to amend its complaint would be unduly prejudicial to Western, and Apollo has not shown good cause for such an amendment.

## CONCLUSION

For the reasons stated above, Apollo's summary judgment motion is granted, and all of Western's affirmative defenses are accordingly stricken. Western's summary judgment motion to strike Apollo's claims for damages based on profits earned by

---

earned from syndication and distribution of the Programs, as required under Section 10 of the Original Agreement, and (iii) the overdue annual financial statements setting forth the Net Receipts (including the calculations thereof), as required under the Section 3d [sic] of the Original Agreement.

Western, profits lost by Apollo, a lost sponsorship from McDonald's, and corrective advertising costs is granted. Western's summary judgment motion to strike Apollo's claim for damages based on a reasonable royalty, and for a ruling in favor of its First Amendment defense, is denied. Apollo's motion for leave to file a second amended complaint is denied.

SO ORDERED:

Dated:     May 5, 2005
           New York, New York

                                   _____
                                   DENISE COTE
                                   United States District Judge